UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CARRIE E. BANKS,                                15-CV-983-RJA-MJR
                                                REPORT AND RECOMMENDATION
                        Plaintiff,

        -v-

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                        Defendant.
_____

        This case has been referred to the undersigned by the Hon. Richard J. Arcara

pursuant to 28 U.S.C. §636(b)(1)(B) for the preparation of a report and recommendation

on dispositive motions.  (Dkt. No. 12).

        Plaintiff Carrie E. Banks brings this action pursuant to 42 U.S.C. §§405(g) and

1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social

Security denying her Social Security disability insurance benefits and Supplemental

Security Income benefits under the Social Security Act (the "Act").  Both parties have

moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  For the following reasons, it is recommended that Banks' motion (Dkt. No.

11) be granted, the Commissioner's motion (Dkt. No. 13) be denied, and this matter be

remanded to the Commissioner for further administrative proceedings consistent with this

Report and Recommendation.

_____
[1]      Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is automatically substituted
for the previously named defendant Carolyn W. Colvin.  The Clerk of Court is directed to amend the caption
accordingly.

## BACKGROUND

I.    *Procedural History*

On September 21, 2012, Banks filed an application for disability insurance benefits ("DIB") alleging disability since May 19, 2010 due to severe back injuries, arthritis, fibromyalgia, asthma, acid reflux, depression, panic attacks, anxiety, and suicidal ideations. (*See* Tr. 65-77, 125-26).[2]  Banks, a certified nursing assistant, injured her back at work in January 2010 while lifting a patient. (Tr. 75, 219-20).  She continued to work as a certified nursing assistant until May 2010, but she has not worked since that time. (Tr. 75).  Banks' DIB application was denied on January 17, 2013 (Tr. 78, 82-89), after which she requested a hearing before an Administrative Law Judge (Tr. 90-91).  Prior to the hearing, on March 12, 2014, Banks filed an application for Supplemental Security Income benefits ("SSI").  (Tr. 138-43).  On April 16, 2014, Banks, represented by counsel, appeared before Administrative Law Judge Robert T. Harvey (the "ALJ") for a hearing. (Tr. 34-64).  On June 11, 2014, the ALJ issued his decision denying Banks' DIB and SSI claims.  (Tr. 11-33).  Banks requested review by the Appeals Council (Tr. 5-10), but on September 23, 2015, the Appeals Council denied Banks' request, making the ALJ's decision the final decision of the Commissioner (Tr. 1-4).  This action followed.

II.    *Summary of the Evidence*

   A.  *Medical Evidence*

Because the medical evidence in the record is voluminous, the Court will briefly summarize only the evidence that is relevant to its findings and recommendations.

---

[2]       References to "Tr." are to the administrative record in this case.

On January 30, 2010, Banks injured her legs, left hand, and lower and upper back while transferring a patient in a Hoyer lift. Two days later, on February 1, 2010, Banks visited Dr. Brent Haskell, who diagnosed contusion of the lower leg, acromioclavicular joint sprain, and sprain of the sacroiliac joint. Dr. Haskell assessed a work status of "restricted duty" and determined that Banks could sit, stand, and walk as tolerated with minimal use of the stairs but that she should not lift more than ten pounds, perform any work above the shoulder level, bend and twist her back more than ten times an hour, use ladders, or drive commercial or industrial vehicles. (Tr. 219-20). At a February 8, 2010 follow-up appointment, Dr. Haskell kept Banks on restricted duty. (Tr. 216-17). At a February 16, 2010 follow-up appointment with Dr. Evan Davies, Dr. Davies kept Banks on restricted duty and concluded that she should not lift more than fifteen pounds or perform more than minimal work above the shoulder level. (Tr. 213-14). On February 19, 2010, Dr. Davies opined that Banks should not lift more than fifteen pounds, bend and twist more than ten times an hour, or perform more than minimal work above the shoulder level. (Tr. 209-10).

Banks received mental health treatment at the Monsignor Carr Institute between August 2011 and August 2012. (Tr. 255-79). In August 2011, Dr. Norma Panahon conducted a psychosocial assessment during which Banks reported a suicide attempt in 2001. Dr. Panahon diagnosed bipolar disorder, generalized anxiety, and borderline personality disorder. (Tr. 258-62). At a December 30, 2011 psychiatric evaluation, Nurse Practitioner Diana Page diagnosed bipolar disorder and borderline personality disorder by history and assessed a Global Assessment of Functioning ("GAF") score between 50

and 55.[3]   (Tr. 276-79).  At an August 7, 2012 appointment, Dr. Panahon diagnosed bipolar disorder and borderline personality disorder and assessed a GAF score of 55. (Tr. 255).

Banks treated with Dr. Glen Smith for neck and back pain, among other things, between May 2012 and January 2014.  (Tr. 348-98, 471-522).  On September 23, 2012 and November 16, 2013, Dr. Smith issued employability assessments stating that Banks is unable to work.  The assessments do not, however, specifically address any functional limitations Banks might have.  (Tr. 397-98, 471-72).

On September 12, 2012, Banks visited Erie County Medical Center reporting suicidal ideation.  She felt out of control and feared she might kill herself or someone else. On examination, Banks was in no apparent distress, made good eye contact, was cooperative, and demonstrated appropriate behavior.  Her speech was normal, her mood was anxious, her affect restricted, and her thought process simple.  She had no current hallucinations or delusions.  She was fully oriented, but her insight and judgment were limited.  Banks was discharged two days later after denying suicidal or homicidal intentions.  (Tr. 330-47).

Banks received mental health treatment, including individual therapy, at Spectrum Human Services between October 2012 and April 2014.  (Tr. 556-680).  At an October 30, 2012 psychiatric assessment, Nurse Practitioner Gerald Frisicaro diagnosed mood disorder not otherwise specified and assessed a GAF score of 45.[4]   (Tr. 587-88).

---

[3]      The GAF scale is used to report an individual's overall level of functioning.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. rev. 2000).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)."  *Id.*

[4]      A GAF score in the range of 41 to 50 indicates "[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school

On November 1, 2012, Banks visited Dr. Gregory Fabiano for a mental consultative examination. Banks described poor sleep, loss of appetite, depressed and dysphoric moods, crying spells, loss of interest, irritability, fatigue, loss of energy, diminished self-esteem, difficulty concentrating, diminished pleasure, social withdrawal, thoughts of death and suicide, and symptoms of panic. On mental status examination, Banks was cooperative, and her manner of relating, social skills, and overall presentation were all adequate. She was neatly dressed, well groomed, exhibited normal posture and motor behavior, and maintained adequate eye contact. Her speech was fluent and clear and her thought processes were coherent and goal directed. There was no evidence of hallucinations, delusions, or paranoia. Her affect was full range and appropriate. Her mood was neutral, and she was fully oriented. She could complete counting tasks, simple calculations, and serial three tests. Her recent and remote memory skills were mildly impaired, perhaps due to anxiety or nervousness. Her cognitive functioning was average while her insight and judgment were good. Dr. Fabiano rendered the following medical source statement:

> The claimant can follow and understand simple directions and instructions. The claimant can perform simple tasks independently. The claimant can maintain attention and concentration. The claimant can maintain a regular schedule. The claimant can learn new tasks. The claimant can perform complex tasks independently. The claimant can make appropriate decisions. The claimant can relate adequately with others. The claimant can appropriately deal with stress.

(Tr. 400-04).

---

functioning (*e.g.*, no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. rev. 2000).

Also on November 1, 2012, Banks visited Dr. Samuel Balderman for a physical consultative examination. Banks stated that her main medical problems are fibromyalgia, reflux esophagitis, asthma, arthritis, and lumbar spine pain. She reported a diagnosis of fibromyalgia one year ago. On examination, Banks was in no acute distress and had a normal gait, but she could not walk on her heels or toes or squat due to poor effort. She did not use assistive devices or need help changing for the examination or getting on and off the examination table, and she could rise from her chair without difficulty. She had full range of motion of her cervical spine. Her lumbar spine flexion was reduced with poor effort, while extension, lateral flexion, and rotary movements were full. Straight leg raising test was negative. Banks could elevate her shoulders to 120 degrees, and she had full range of motion of her elbows, forearms, wrists, hips, knees, and ankles. Her joints were stable and non-tender with no redness, heat, swelling, or effusion. There were no trigger points. Deep tendon reflexes were normal, and no sensory deficit was noted. She had full strength in her arms and 4/5 strength in her legs. Her hand and finger dexterity were intact, and her grip strength was full. Lower back x-rays showed narrowing disc space, while x-rays of her neck revealed degenerative changes. Dr. Balderman diagnosed asthma and somatosensory[5] disorder and rendered the following medical source statement: "[t]he claimant's limitations are related to her somatosensory disorder." (Tr. 405-10).

On January 15, 2013, Dr. Juan Echevarria, a state agency reviewing psychiatrist, reviewed the medical evidence of record and assessed no significant limitations in Banks' ability to remember locations and work-like procedures or understand and remember very

---

[5]     "Somatosensory" means "[s]ensation relating to the body's superficial and deep parts as contrasted to specialized senses such as sight." Stedman's Medical Dictionary (28th ed. 2006).

short and simple instructions. Dr. Echevarria assessed moderate limitations in Banks' ability to understand and remember detailed instructions due to anxiety and nervousness, and no limitations in her sustained concentration and persistence, social interaction, or adaptation. (Tr. 70-74).

On April 5, 2013, Dr. Gurcharan Singh, a state agency reviewing physician, opined that Banks can occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Dr. Singh further opined that Banks has no limitations with regard to pushing and pulling, that she can occasionally climb ladders, ropes, and scaffolds, frequently perform all other postural maneuvers, and has no manipulative, visual, or communicative limitations. (Tr. 420-26).

On September 6, 2013, Banks visited Dr. Prem Tambar, a rheumatologist, for "total body pain." Dr. Tambar's notes indicate that Banks had visited another physician, Dr. Danilo Saldana,[6] for the diagnosis of fibromyalgia. (Tr. 492).

Between September 2013 and March 2014, Banks treated with Dr. Pratibha Bansal for lower back and neck pain. (Tr. 440-68). Dr. Bansal noted at a September 26, 2013 appointment that Dr. Saldana had treated Banks for fibromyalgia for one year. (Tr. 463-68).

B. _Administrative Hearing Testimony_

Born in 1966, Banks was forty-eight-years old at the time of the hearing. (Tr. 38). She has a high school education and previously worked as a certified nursing assistant. (Tr. 38, 50). Banks testified that she suffers from depression, panic disorder, sharp pain

---

[6]     Banks refers to Dr. Danilo Saldana as "Dr. Saldano."

in her back that radiates into her left leg, neck pain that radiates into her left arm, and fibromyalgia. (Tr. 39-40). She cannot concentrate because of depression and feels moody, "down," and overwhelmed. (Tr. 41). She experiences panic symptoms two or three times a day and depressive symptoms nearly every day. (Tr. 41-42). She tried to hurt herself more than once, but not since 2012. (Tr. 40, 45). Regarding her physical symptoms, she has constant pain in her lower back, left leg, left arm, and neck. (Tr. 42). She experiences muscle spasms and cramping when engaging in activity. (Tr. 42-44). She also suffers from fatigue and joint pain as a result of her fibromyalgia. (Tr. 44).

Banks' daily activities include "some" cleaning and cooking. (Tr. 50-51). She does the dishes and makes the bed, but she does not vacuum or do laundry. (Tr. 51). She does "some" sweeping, but she does not mop, take out the trash, or do yard work. (*Id.*). She does not drive a car. (Tr. 52). She can walk one or two blocks and sit and stand for twenty to twenty-five minutes. (Tr. 53). She can lift only two to three pounds and has trouble reaching overhead, pushing, pulling, squatting, and bending. (Tr. 52-54). She struggles to dress and bathe herself and has difficulty sleeping due to pain and paranoid thoughts. (Tr. 52).

## DISCUSSION

I.    *Scope of Judicial Review*

The Court's review of the Commissioner's decision is deferential. Under the Act, the Commissioner's factual determinations "shall be conclusive" so long as they are "supported by substantial evidence," 42 U.S.C. §405(g), that is, supported by "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks

and citation omitted). "The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts." *Smith v. Colvin*, 17 F. Supp. 3d 260, 264 (W.D.N.Y. 2014). "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the Court may "not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). Thus, the Court's task is to ask "'whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached' by the Commissioner." *Silvers v. Colvin*, 67 F. Supp. 3d 570, 574 (W.D.N.Y. 2014) (quoting *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)).

Two related rules follow from the Act's standard of review. The first is that "[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). The second rule is that "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve." *Veino*, 312 F.3d at 588. While the applicable standard of review is deferential, this does not mean that the Commissioner's decision is presumptively correct. The Commissioner's decision is, as described above, subject to remand or reversal if the factual conclusions on which it is based are not supported by substantial evidence. Further, the Commissioner's factual conclusions, even if supported by substantial evidence, must be applied to the correct legal standard. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). Failure to apply the correct legal standard is reversible error. *Id.*

II.    _Standards for Determining "Disability" Under the Act_

A "disability" is an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner may find the claimant disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  _Id._ §§423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner must make these determinations based on "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . [the claimant's] educational background, age, and work experience."  _Dumas v. Schweiker_, 712 F.2d 1545, 1550 (2d Cir. 1983) (first alteration in original) (quoting _Miles v. Harris_, 645 F.2d 122, 124 (2d Cir. 1981)).

To guide the assessment of whether a claimant is disabled, the Commissioner has promulgated a "five-step sequential evaluation process."  20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).  First, the Commissioner determines whether the claimant is "working" and whether that work "is substantial gainful activity."  _Id._ §§404.1520(b), 416.920(b).  If the claimant is engaged in substantial gainful activity, the claimant is "not disabled regardless of [his or her] medical condition or . . . age, education, and work experience."  _Id._ §§404.1520(b), 416.920(b).  Second, if the claimant is not engaged in substantial gainful

activity, the Commissioner asks whether the claimant has a "severe impairment." *Id.* §§404.1520(c), 416.920(c). To make this determination, the Commissioner asks whether the claimant has "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* §§404.1520(c), 416.920(c). As with the first step, if the claimant does not have a severe impairment, he or she is not disabled regardless of any other factors or considerations. *Id.* §§404.1520(c), 416.920(c). Third, if the claimant does have a severe impairment, the Commissioner asks two additional questions: first, whether that severe impairment meets the Act's duration requirement, and second, whether the severe impairment is either listed in Appendix 1 of the Commissioner's regulations or is "equal to" an impairment listed in Appendix 1. *Id.* §§404.1520(d), 416.920(d). If the claimant satisfies both requirements of step three, the Commissioner will find that he or she is disabled without regard to his or her age, education, and work experience. *Id.* §§404.1520(d), 416.920(d).

If the claimant does not have the severe impairment required by step three, the Commissioner's analysis proceeds to steps four and five. Before doing so, the Commissioner must "assess and make a finding about [the claimant's] residual functional capacity ["RFC"] based on all the relevant medical and other evidence" in the record. *Id.* §§404.1520(e), 416.920(e). RFC "is the most [the claimant] can still do despite [his or her] limitations." *Id.* §§404.1545(a)(1), 416.945(a)(1). The Commissioner's assessment of the claimant's RFC is then applied at steps four and five. At step four, the Commissioner "compare[s] [the claimant's] residual functional capacity assessment . . . with the physical and mental demands of [his or her] past relevant work." *Id.* §§404.1520(f), 416.920(f). If, based on that comparison, the claimant is able to perform

his or her past relevant work, the Commissioner will find that the claimant is not disabled within the meaning of the Act. *Id.* §§404.1520(f), 416.920(f). Finally, if the claimant cannot perform his or her past relevant work, then at the fifth step the Commissioner considers whether, based on the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." *Id.* §§404.1520(g)(1), 416.920(g)(1). If the claimant can adjust to other work, he or she is not disabled. *Id.* §§404.1520(g)(1), 416.920(g)(1). If, however, the claimant cannot adjust to other work, he or she is disabled within the meaning of the Act. *Id.* §§404.1520(g)(1), 416.920(g)(1).

The burden through steps one through four described above rests on the claimant. If the claimant carries his burden through the first four steps, "the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform." *Carroll*, 705 F.2d at 642.

III.     *The ALJ's Decision*

The ALJ followed the required five-step analysis for evaluating disability claims. Under step one, the ALJ found that Banks has not engaged in substantial gainful activity since May 19, 2010, her alleged onset date. (Tr. 16). At step two, the ALJ concluded that Banks has the following severe impairments: "depressive disorder, panic disorder, lumbago and cervicalgia." (*Id.*). At step three, the ALJ found that Banks does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 17). Before proceeding to step four, the ALJ assessed Banks' RFC as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in [20 C.F.R. §§404.1567(b) and 416.967(b)][7] except she cannot work in areas with unprotected heights or work around heavy, moving or dangerous machinery. She has occasional limitations in bending, climbing, stooping, squatting and crawling. She is unable to climb ropes, ladders or scaffolds. The claimant has occasional limitations in dealing with stress.

(Tr. 18). Proceeding to step four, the ALJ found that Banks is unable to perform her past relevant work as a nursing assistant. (Tr. 28). At the fifth step, the ALJ considered Banks' age, education, work experience, RFC, and the testimony of a vocational expert to conclude that she can perform jobs that exist in significant numbers in the national economy, namely Cleaner/Housekeeper and Order Caller. (Tr. 29-30). Accordingly, the ALJ found that Banks can successfully adjust to other work and, therefore, that she has not been under a disability within the meaning of the Act from her alleged May 19, 2010 onset date through the date of the ALJ's decision. (Tr. 29).

IV.    *Banks' Challenges*

Banks challenges the Commissioner's disability decision on two grounds: (1) the ALJ failed to adequately develop the record; and (2) the ALJ violated the "treating physician rule" by failing to properly weigh the opinion of one of her treating physicians, Dr. Davies. The Court will address each argument in turn.

A.    *Development of the Record*

Banks argues that the ALJ failed to adequately develop the record by: (1) not making any effort to obtain records from Dr. Saldana, who diagnosed Banks with

---

[7]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§404.1567(a), 416.967(b).

fibromyalgia; (2) failing to follow up with Spectrum Human Services to find out why Banks wore hospital scrubs to an October 30, 2012 appointment with Nurse Practitioner Frisicaro[8]; and (3) not requesting a medical source statement from one of her treating physicians regarding her mental impairments.

## 1. *Dr. Saldana's Records*

In assessing Banks' serious impairments, the ALJ noted that Dr. Tambar reported at a September 3, 2013 appointment that Dr. Saldana had diagnosed Banks with fibromyalgia. (Tr. 16). However, because Dr. Saldana's treatment notes are not in the record, the ALJ did not recognize fibromyalgia as a medically determinable impairment. Banks argues that the ALJ should have attempted to obtain Dr. Saldana's treatment notes before reaching this conclusion and rendering his disability decision. The Court agrees.

Given "the essentially non-adversarial nature of a benefits proceeding," the ALJ "must . . . affirmatively develop the record." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)). The ALJ's duty to develop the record applies even when the claimant is represented by counsel. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The duty is not without limit — the ALJ need only "make every *reasonable* effort to develop [the claimant's] complete medical record." *Iannopollo v. Barnhart*, 280 F. Supp. 2d 41, 50 n.13 (W.D.N.Y. 2003).

Here, as part of her DIB application, Banks completed a questionnaire that lists Dr. Saldana as one of her treating physicians. (Tr. 168). A disability examiner who reviewed Banks' application requested records from Dr. Saldana in October 2012, but the examiner's worksheet indicates that Dr. Saldana did not respond to the requests. (Tr.

---

[8] Banks states that the October 30, 2012 appointment was with Nurse Practitioner Pfalzer, but the appointment was actually with Nurse Practitioner Frisicaro. (Tr. 587-88).

411).  At the ALJ hearing on April 16, 2014, neither the ALJ nor Banks' counsel made any mention of Dr. Saldana, and it does not appear that the ALJ ever requested Dr. Saldana's treatment notes.  Had the ALJ received records from Dr. Saldana, he might very well have rendered a different disability determination, as two other physicians who treated Banks, Dr. Bansal and Dr. Tambar, indicated in their treatment notes that Dr. Saldana had diagnosed Banks with fibromyalgia and treated her for that condition for one year.  (Tr. 463, 492).  By not requesting Dr. Saldana's records, the ALJ failed in his duty to affirmatively develop the record.  This matter should therefore be remanded to allow the ALJ to make every reasonable effort to obtain Dr. Saldana's records.

### 2. *October 30, 2012 Appointment with Nurse Frisicaro*

On October 30, 2012, Banks visited Nurse Frisicaro at Spectrum Human Services for a psychiatric assessment.  (Tr. 587-88).  Nurse Frisicaro's notes indicate that Banks wore hospital scrubs to the appointment.  Banks argues that the ALJ should have explored why she wore scrubs, since she believes that wearing scrubs indicates that she came to the appointment straight from a psychiatric-related emergency room visit.

Banks' argument that she might have had an emergency room visit immediately before visiting Nurse Frisicaro is speculative and unsupported by the record.  Had such a visit occurred, it likely would have been included in Nurse Frisicaro's treatment notes, particularly because Nurse Frisicaro's notes recite some of Banks' prior mental health treatment.  The ALJ's duty to develop the record does not extend nearly as far as Banks would like it to.  *See Knight v. Astrue*, 32 F. Supp. 3d 210, 222 (N.D.N.Y. 2012) ("Although the ALJ has an affirmative duty to develop the record, the ALJ is not required to obtain

every conceivable piece of information . . . .").  Therefore, the ALJ did not err by declining to explore why Banks wore scrubs to one of her many medical appointments.

### 3. _Medical Source Statement_

Banks also argues that the ALJ should have requested a medical source statement from one of her treating physicians regarding her mental impairments.  An ALJ's failure to request a medical source statement from a treating source does not require remand so long as the record contains sufficient evidence from which the claimant's residual functional capacity can be determined.  _See Tankisi v. Comm'r of Soc. Sec._, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order); _see also Pellam v. Astrue_, 508 F. App'x 87, 89-90 (2d Cir. 2013) (summary order) (finding no error in failure to acquire medical source statement from claimant's treating physicians where the ALJ's RFC assessment was supported by the opinion of a consultative examiner and the ALJ had treatment notes from the claimant's treating physicians).

Here, the record contains sufficient evidence from which Banks' mental residual functional capacity could be determined.  In particular, the record includes a mental consultative examination by Dr. Fabiano and an opinion by Dr. Echevarria, the state agency reviewing psychiatrist, both of which the ALJ cited in assessing Banks' RFC.  (Tr. 26-27).  In addition to the opinion evidence, the record contains over one-hundred pages of treatment notes reflecting Banks' mental health treatment at the Monsignor Carr Institute, Spectrum Human Services, and Erie County Medical Center.  Given the opinion evidence and voluminous treatment notes, the ALJ's failure to request a medical source

statement from a treating physician does not require remand.[9]  *See Tankisi*, 521 F. App'x at 34; *Pellam*, 508 F. App'x at 89-90.

### B.  *Dr. Davies' Opinion*

Banks next argues that the ALJ violated the treating physician rule by failing to properly weigh Dr. Davies' February 19, 2010 opinion that she should not lift more than fifteen pounds, bend and twist more than ten times an hour, or perform more than minimal work above the shoulder level.  Dr. Davies' opinion conflicts in certain respects with the ALJ's conclusion that Banks retains the RFC to perform a range of light work — which involves, among other things, lifting up to twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds — as well as the ALJ's conclusion that Banks has no limitations with regard to reaching and only occasional limitations in bending.  According to Banks, had the ALJ applied the treating physician rule to Dr. Davies' opinion, he might have arrived at a different RFC determination and ultimately concluded that she cannot adjust to other work.

The treating physician rule requires the ALJ to give controlling weight to a treating source's medical opinion when the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2).  If the ALJ elects not to give a treating source's opinion controlling weight, he must consider certain factors in determining what weight to give the opinion, namely, the frequency of

---

[9]     *Swanson v. Colvin*, No. 12-CV-645S, 2013 WL 5676028, at *5 (W.D.N.Y. Oct. 17, 2013), relied upon by Banks in her memorandum of law, is inapposite because the ALJ in that case failed to request a medical source statement from a treating physician who had found the plaintiff to be "permanently disabled." To compare, here, Banks has not identified a particular treating physician from whom the ALJ purportedly should have obtained a medical source statement, let alone a treating physician who opined that she is permanently disabled.

examination, the length, nature, and extent of the treatment relationship, the amount of evidence supporting the opinion, the consistency of the opinion with the record as a whole, whether the treating source is a specialist, and any other factor that tends to support or contradict the opinion. *See id.* §§404.1527(c)(2), 416.927(c)(2). "After considering the above factors, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (alteration in original) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)). The regulations state that the Commissioner "will always give good reasons" for the weight assigned to a treating source's medical opinion. 20 C.F.R. §§404.1527(c)(2), 416.927(c)(2). "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific." *Miller v. Colvin*, 122 F. Supp. 3d 23, 28 (W.D.N.Y. 2015) (internal quotation marks and citations omitted). The ALJ's failure to provide good reasons for the weight he assigns to a treating source's opinion ordinarily requires remand. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician['s] opinion . . . .").

Here, the ALJ found Dr. Davies to be a treating physician (*see* Tr. 22), but he did not specify the weight, if any, he gave to Dr. Davies' February 19, 2010 opinion. However, given that the ALJ's RFC determination conflicts with Dr. Davies' opinion in certain respects, it appears that the ALJ did not give the opinion controlling weight. Thus, the ALJ should have applied the factors in 20 C.F.R. §§404.1527(c) and 416.927(c) to determine what weight to give the opinion. The ALJ appears to have indirectly considered

two of the factors — namely, the consistency of Dr. Davies' opinion with the record as a whole and some of the evidence supporting Dr. Davies' opinion (*see* Tr. 20) —, but not the frequency of examination, the length, nature, and extent of Banks' treatment relationship with Dr. Davies, or whether Dr. Davies is a specialist. The ALJ's failure to provide a meaningful discussion of the applicable factors in considering Dr. Davies' opinion and to provide good reasons for the weight, if any, he assigned to the opinion constitutes a violation of the treating physician rule. Therefore, this matter should be remanded to allow the ALJ to properly apply the treating physician rule to Dr. Davies' February 19, 2010 opinion.

## CONCLUSION

For the foregoing reasons, it is recommended that Banks' motion for judgment on the pleadings (Dkt. No. 11) be granted, the Commissioner's motion for judgment on the pleadings (Dkt. No. 13) be denied, and this matter be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Arcara.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE***

**RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law, and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with these provisions may result in the District Court's refusal to consider the objection.**

SO ORDERED.

Dated:     September 20, 2017
             Buffalo, New York

/s/ *Michael J. Roemer*
MICHAEL J. ROEMER
United States Magistrate Judge